WILLIAMS, KASTNER & GIBBS PLLC
Theresa H. Rava, SBN 272343
trava@williamskastner.com
601 Union Street, Suite 4100
Seattle, WA   98101
Telephone:  (206) 628-6600
Fax:  (206) 628-6611

*Attorneys for Plaintiffs F-19 Holdings, LLC
and F19 Franchising, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| F19 FRANCHISING, LLC, a California limited liability company; F-19 HOLDINGS, LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> ENDO FITNESS LL, LLC, a California limited liability company, ENDO FITNESS 3, LLC, a California limited liability company, ENDO FITNESS, LLC, a California limited liability company, ROBERT RODGER, individually, PAUL RICE, individually, PAUL INFALD, individually, and ADAM OSBORN, individually, <br><br> Defendants. | NO.  2:23-CV-00185-MEMF-JC <br><br> **DECLARATION OF CASEY PIROG** <br><br> Judge: Hon. Maame Ewusi-Mensah Frimpong <br> Dept.: Courtroom 8B <br><br> Complaint Filed: January 11, 2023 |

7733142.1

**DECLARATION OF CASEY PIROG**

I, Casey Pirog, declare as follows:

1.     I have been working for F-19 Holdings, LLC ("Holdings") since 2003. I have also been a consultant for F19 Franchising, LLC ("Franchising") since 2003.  I make this declaration on my own personal knowledge. The matters stated herein are true of my own knowledge, and if called upon to testify, I would and could competently testify thereto.

2.     As an employee of Holdings, I have numerous responsibilities, including but not limited to, equipment orders for clubs, negotiating pricing for club vendors, including equipment software subscriptions, equipment, and insurance, manage website redesign, manage club openings, accounting management, and more. As a consultant for Franchising, I am responsible for communications of the prospective sales of new franchise locations to the owners of Franchising. I have regular contact with franchise owners, and whenever franchisee owners need to contact either Holdings or Franchising I am the person they contact. I also managed the Maple Valley club from 2004-2009.

3.     Fitness 19® is a national brand of 80 fitness clubs offering affordable gym membership rates in 12 states. The majority of Fitness 19 clubs are located in California.

4.     The Fitness 19 clubs are marketed on F19's website, Fitness19.com, which bears its registered FITNESS 19 mark. Below is a true and correct copy of the FITNESS 19 Mark as it is depicted on the Fitness19.com website:



5.     The brand was founded in 2002 by F-19 Holdings, LLC ("Holdings"). It was built on the concept that the traditional health club model

wasn't meeting the needs of most people and it offered extremely affordable, family-friendly facilities with state-of-the-art cardio, strength, and free weight equipment without long-term contracts. The "19" in the Fitness 19 name stood for the maximum price of a monthly membership when Fitness 19 clubs first opened 20 years ago.  Today, depending on the location, $19 memberships (and lower) are still available. Fitness 19 continues to maintain its reputation as an affordable, family-friendly gym.

6.      In 2009, Holdings began offering Fitness 19 franchises through F19 Franchising, LLC ("Franchising"). All existing Fitness 19 clubs were converted into franchises and club owners entered into franchise agreements with Franchising.

7.      Holdings' Marks have been in continuous use since 2002, more than 20 years.

8.      Matt Vanderyacht has owned and/or operated more than 20 Fitness 19 locations since 2003.

9.      Sean Naughton has owned and/or operated 17 Fitness 19 locations since 2006.

10.     Victor Poma has owned and/or operated 20 Fitness 19 locations since 2006.

11.     Brad Ballintine has owned and/or operated more than 5 Fitness 19 locations since 2006.

12.     In 2003-2004, Defendant Paul Infald entered into a partnership with Holdings to open and own Fitness 19 clubs. After Franchising was established, Infald signed franchise agreements for each Fitness 19 club he owned. In all, Infald has signed approximately 18 franchise agreements for Fitness 19 clubs owned directly by him. Infald currently owns 13 Fitness 19 clubs.

13.     In 2003-2004, Defendant Paul Rice entered into a partnership with Holdings to open and own Fitness 19 clubs. Rice owns his Fitness 19 clubs

2

7733142.1

thorough Innovative Fitness Club, Consulting, Inc. After Franchising was established, Rice signed franchise agreements for each Fitness 19 club he owned. In all, Rice has signed approximately 37 franchise agreements. Through his company, Rice currently owns 22 Fitness 19 clubs.

14.    Defendant Robert Rodger has been managing Fitness 19 clubs since 2003-2004. Rodger signed three Fitness 19 franchise agreements for clubs he previously owned, but are now closed. Through his company, ARC Consulting, Inc., Rodger signed franchise agreements and currently owns two Fitness 19 clubs.

15.    Defendant Adam Osborn has been managing Fitness 19 clubs since 2003-2004.

16.    Since 2019, the ENDO Partners have developed and currently own/operate ten Fitness 19 clubs.

17.    Combined, the ENDO Partners, Rice, Innovative Fitness, and ARC currently own 36 authorized Fitness 19 clubs.

18.    On February 4, 2022, I emailed Endo Partner, Robert Rodger franchise agreements for Fitness 19 franchises in Morgan Hill, American Canyon, West Covina, and Loma Linda. A true and correct copy of my February 4, 2022 email(without attachments) to Robert Rodger is attached to this declaration as **Exhibit L**.

19.    The 10 Fitness 19 franchise agreements signed for the ENDO Fitness 19 clubs have essentially identical terms in connection with the Fitness 19 marks.

20.    On February 16, 2022, Robert Rodger returned signed franchise agreements for the Morgan Hill, American Canyon, and West Covina locations. A true and correct copy of Robert Rodger's February 16, 2022 email (without attachments) to me is attached to this declaration as **Exhibit M**.

DECLARATION OF CASEY PIROG

21.     Holdings licenses its Marks to Franchising through an Intellectual Property License Agreement. The current agreement is the 2015 Amended and Restated Intellectual Property License Agreement. A true and correct copy of the Amended and Restated Intellectual Property License Agreement are attached to this declaration as **Exhibit N**.

22.     Franchising's franchise agreements have been revised from time to time, but the quality control provisions remain essentially the same.

23.     A true and correct copy of the Fitness 19 franchise agreement signed by ENDO Partner Robert Rodger for the Fitness 19 club in Claremont, California is attached to this declaration as **Exhibit O**.

24.     Franchising, through its members, consultants, franchise owners, and franchise employees, regularly inspects franchised clubs to ensure that the Fitness 19 Marks are being used appropriately.

25.     Over the years, Franchising has retained Fitness 19 franchisee owners, longtime franchisee employees, and Franchising consultants to conduct inspections of other Fitness 19 clubs, including Matt Vanderyacht, Erica Frith, Ryan Frith, Aisha Jalil, Thomas Graves, Amber Russell, and Dave Russell.

26.     I am familiar with the Fitness 19 Marks. I regularly inspect franchise clubs. I am familiar with the Fitness 19 gyms and I do not carry a checklist with me when I inspect clubs. The following is a non-inclusive list of items I inspect when I inspect a Fitness 19 gym:

   a. Cleanliness;

   b. Staffing: attentiveness to guests and members, appropriate clothing, location in the gym;

   c. Equipment: duration, quantity, whether it is out of order;

   d. Bathrooms: clean and fixtures functioning;

   e. Maintenance of floors, walls, signage, lighting, and the club in general;

f. Overall atmosphere;

g. Club operations: member check-in, guest procedures, personal training;

h. Club signage on building is in good condition.

27. Between July 2017 and June 2022, I conducted at least 39 Fitness 19 club inspections, including the following:

i. Seattle, WA gym – July 2017

ii. Mountlake Terrace, WA gym – July 2017

iii. Federal Way, WA gym – July 2017

iv. Corona, CA gym – November 2017

v. San Clemente gym – November 2017

vi. Seattle, WA gym – December 2017

vii. Mountlake Terrace, WA gym – December y 2017

viii. Federal Way, WA gym – December 2017

ix. Brea, CA gym – February 2018

x. Seattle, WA gym – April 2018

xi. Mountlake Terrace, WA gym – April 2018

xii. Federal Way, WA gym – April 2018

xiii. Seattle, WA gym – October 2018

xiv. Mountlake Terrace, WA gym – October 2018

xv. Federal Way, WA gym – October 2018

xvi. Seattle, WA gym – January 2019

xvii. Mountlake Terrace, WA gym – January 2019

xviii. Federal Way, WA gym – January 2019

xix. Seattle, WA gym – May 2019

xx. Mountlake Terrace, WA gym – May 2019

xxi. Federal Way, WA gym – May 2019

xxii. Seattle, WA gym – November 2019

DECLARATION OF CASEY PIROG

7733142.1

xxiii.  Mountlake Terrace, WA gym – November 2019

xxiv.  Federal Way, WA gym – November 2019

xxv.  Seattle, WA gym – March 2020

xxvi.  Mountlake Terrace, WA gym – March 2020

xxvii.  Federal Way, WA gym – March 2020

xxviii.  Seattle, WA gym – December 2020

xxix.  Mountlake Terrace, WA gym – December 2020

xxx.  Federal Way, WA gym – December 2020

xxxi.  Seattle, WA gym – June 2021

xxxii.  Mountlake Terrace, WA gym – June 2021

xxxiii.  Federal Way, WA gym – June 2021

xxxiv.  Seattle, WA gym – December 2021

xxxv.  Mountlake Terrace, WA gym – December 2021

xxxvi.  Federal Way, WA gym – December 2021

xxxvii.  Seattle, WA gym – June 2022

xxxviii.  Mountlake Terrace, WA gym – June 2022

xxxix.  Federal Way, WA gym – June 2022

28.  More inspections would have been conducted in the past three years except that gyms were closed for a period of time due to the Covid 19 pandemic and  travel restrictions due to the pandemic hindered inspections.

29.  Holdings and Franchising have not received any complaints about the quality of the Marks.

/ / /

/ / /

/ / /

6

7733142.1

30.    Defendants intend to open a Fitness 19 club in Loma Linda on April 15, 2023 without authorization or a franchise agreement. Holdings and Franchising will suffer immediate and irreparable harm if the Loma Linda club is allowed to open as a Fitness 19 club. The public has no way of knowing that the Loma Linda club is not connected to the Fitness 19 franchise and is an unauthorized club.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April _6_, 2023.

_____
CASEY PIROG

DECLARATION OF CASEY PIROG

7733142.1

**PROOF OF SERVICE**

(1)    I, the undersigned, declare as follows: I am over the age of eighteen years and not party to the within entitled action; my business address is 601 Union St., Suite 4100, Seattle, WA 98101.

(2)    On April 25, 2023, I electronically served a true and correct copy of Declaration of Casey Pirog.

(3)    I electronically served a true and correct of the document listed in (2) as follows:

Name of Persons Served:
Name of Persons Served: Steve Feldman, Jessica Rosen, Jeffrey Kobulnick, and Heidy Nurinda of Lewitt, Hackman, Shapiro, Marshall & Harlan On behalf of Plaintiffs.
Electronic Service Address: SFeldman@lewitthackman.com, JRosen@lewitthackman.com, jkobulnick@lewitthackman.com, and hnurinda@lewitthackman.com.


Date of Service:  April 25, 2023


I declare under penalty of perjury under the laws of the States of Washington and California that the foregoing is true and correct.

Signed on April 25, 2023, at Seattle, Washington.


 /s/Azra Hadzic
AZRA HADZIC
Paralegal, Williams Kastner & Gibbs, PLLC

7733142.1

# EXHIBIT L

## Hadzic, Azra

| | |
|---|---|
| **From:** | Casey Pirog <casey@fitness19.com> |
| **Sent:** | Friday, February 4, 2022 9:26 AM |
| **To:** | bobrodger19@gmail.com |
| **Cc:** | Thomas Graves; Packy; Robert Lineberger; Paul INFALD; Paul Rice |
| **Subject:** | Re: Franchise Agreement Conversation |
| **Attachments:** | Loma Linda Franchise.pdf; Morgan Hill Franchise.pdf; American Canyon Franchise.pdf; West Covina Franchise.pdf |

Hi Bob,
Thank you for sending us your pro forma. Holdings has decided to guarantee the lease in Loma Linda. Attached you will find the Loma Linda franchise agreement. Please sign and return, and then I will get a fully executed copy to you.

We have also accepted your signed franchise agreements for West Covina, American Canyon, and Morgan Hill without your addendums, as we cannot change this franchise agreement during litigation. I've attached the 3 franchise agreements for signature. Please sign and return, so I can send you fully executed copies.

And lastly, since you've said you are interested in further discussing a gross deal, we look forward to working with you on that.

Thank you,
Casey

IMPORTANT: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Please advise immediately if you or your employer do not consent to Internet email for messages of this kind. Opinions, conclusions and other information contained in this e-mail message that do not relate to the official business of Fitness 19 shall be understood as neither given nor endorsed by it

# EXHIBIT M

**Hadzic, Azra**

| | |
|---|---|
| **From:** | Bob Rodger <bobrodger19@gmail.com> |
| **Sent:** | Wednesday, February 16, 2022 3:16 PM |
| **To:** | Casey Pirog |
| **Cc:** | Thomas Graves; Packy; Robert Lineberger; Paul INFALD; Paul Rice |
| **Subject:** | Re: Franchise Agreement Conversation |
| **Attachments:** | ENDO Fitness 1 Franchisee Executed FA.pdf; ENDO Fitness 2 Franchisee Executed FA.pdf; ENDO Fitness 4 Franchisee Executed FA.pdf |

Casey,

See attached executed Franchise Agreements.   Please return counter-executed at your earliest convenience.  As we are aggrieved by various provisions of this agreement, we remain interested in negotiating a new version of the Franchise Agreement and intend to have a redline to you shortly to that effect.

Thank you,
Bob

On Fri, Feb 4, 2022 at 9:26 AM Casey Pirog <casey@fitness19.com> wrote:
 Hi Bob,
 Thank you for sending us your pro forma. Holdings has decided to guarantee the lease in Loma Linda. Attached you will find the Loma Linda franchise agreement. Please sign and return, and then I will get a fully executed copy to you.

 We have also accepted your signed franchise agreements for West Covina, American Canyon, and Morgan Hill without your addendums, as we cannot change this franchise agreement during litigation. I've attached the 3 franchise agreements for signature. Please sign and return, so I can send you fully executed copies.

 And lastly, since you've said you are interested in further discussing a gross deal, we look forward to working with you on that.


 Thank you,
 Casey

IMPORTANT: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. Please advise immediately if you or your employer do not consent to Internet email for messages of this kind. Opinions, conclusions and other information contained in this e-mail message that do not relate to the official business of Fitness 19 shall be understood as neither given nor endorsed by it

# EXHIBIT N

## AMENDED AND RESTATED INTELLECTUAL PROPERTY LICENSE AGREEMENT

**THIS AMENDED AND RESTATED INTELLECTUAL PROPERTY LICENSE AGREEMENT** (the "Agreement"), dated as of December 28, 2015, is entered into between **F-19 HOLDINGS, LLC**, a Delaware limited liability company ("Licensor"), and **F19 Franchising, LLC** a California limited liability company ("Licensee").

### RECITALS

A.      Licensor and Licensee are parties to that certain Intellectual Property License Agreement (the "Existing IP License Agreement") dated January 1, 2009 (the "Effective Date"), and the parties now wish to amend and restate the Existing IP License Agreement in its entirety and to accept the rights and obligations set forth in this Agreement in lieu of the rights and obligations set forth in the Existing IP License Agreement.

B.      Licensor is the owner of all right, title and interest in and to the Intellectual Property (defined below).

C.      Licensee is an affiliate of Licensor and is and will be engaged in granting franchises and licenses to third parties, pursuant to written Franchise Agreements, for the development, ownership and operation of Fitness Clubs.  Under the Franchise Agreements, Licensee may obligate itself to provide certain services to Franchisees and may reserve the right to select the suppliers of all products, equipment, services, supplies and materials for the Fitness Clubs, and to arrange for the manufacture, distribution, purchase and sale, as applicable, of such products, equipment, services, supplies and materials (collectively, the "Franchise Services").

D.      Licensee desires to license the Intellectual Property from Licensor, and Licensor desires to grant such license to Licensee, on the terms and conditions set forth in this Agreement.

### AGREEMENT

**FOR AND IN CONSIDERATION** of the foregoing Recitals, the covenants expressed herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      **Certain Definitions**.  The following terms shall have the following meanings:

"Confidential Information" means information (including Know-How) treated as confidential and proprietary by its owner that is disclosed by one party hereto (the "Discloser"), either directly or indirectly, in writing or orally, to the other party hereto (the "Recipient").

"Fitness Club"  means a fitness facility that operates under the name *Fitness 19*®, and that uses the Intellectual Property in connection therewith.

"Franchise Agreement" means the form of franchise agreement or trademark license agreement, approved by Licensor from time to time, to which Licensee and Franchisees

1

are or will be party and which govern the development and operation by Franchisee of a Fitness Club.

"Franchise Services" has the meaning set forth in the Recitals of this Agreement.

"Franchisee" means the entity identified as "franchisee" or "licensee" under a Franchise Agreement.

"Intellectual Property" means all of Licensor's intellectual property rights of any kind, whether now existing or subsequently created, developed, or acquired by or on behalf of, and owned by, Licensor during the Term of this Agreement, that are involved in establishing and operating Fitness Clubs, in serving as a "franchisor" or "licensor" of Fitness Clubs, or in otherwise administering or providing goods and services to Fitness Clubs, including, without limitation, all (a) trademarks, service marks, trade dress, designs, logos, and other indicia of origin, whether registered or unregistered, and all goodwill of any business associated and connected therewith and symbolized thereby ("Trademarks"); (b) domain names utilizing or incorporating the Trademarks or parts thereof with generic top level domains (e.g., .com, .org, .biz and .net); (c) patents, inventions described and claimed therein (including divisionals, continuation-in-parts, provisionals, reissues, reexaminations or interferences thereof), whether or not any such patents are modified, withdrawn or resubmitted ("Patents"); (d) copyrights, whether registered or unregistered ("Copyrights"); (e) trade secrets, know-how, inventions, processes, procedures, techniques, discoveries, technical information and data, specifications, research and development information, engineering drawings, operating and maintenance manuals, and other similar information and rights ("Know-How"); and (f) registrations, applications, reservations, renewals or extensions relating to any of the foregoing.  For the avoidance of doubt, the Intellectual Property shall include, but not be limited to, all items listed in Schedule 1 hereto.

"Sublicensee" has the meaning set forth in Section 7(a).

"Term" has the meaning set forth in Section 3.

2.    **Grant of License.**

(a)    Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee accepts, an exclusive worldwide license during the Term to use and to sublicense all of the Intellectual Property in connection with the Franchise Services, including, without limitation, in connection with Licensee's rights and obligations under Franchise Agreements.

(b)    Licensor expressly reserves all other rights with respect to the Intellectual Property not expressly granted to Licensee herein.

3.    **Term and Termination**.

(a)    This Agreement shall remain in effect for a term (the "Term") commencing as of the Effective Date, and terminating 99 years thereafter; provided, however, that Licensor may terminate this Agreement (i) upon a material breach of this Agreement by Licensee that is not

2

cured within 30 days following written notice from Licensor; or (ii) if Licensee ceases to be an affiliate of Licensor.

(b)    Notwithstanding the termination or expiration of this Agreement, Licensor agrees that termination or expiration of this Agreement will not affect Licensee's then-existing Franchise Agreements with its Franchisees or any renewal term thereof and shall only terminate Licensee's license with respect to new Franchisees from the effective date of termination or expiration.

4.    **Quality Control**.

(a)    Licensee agrees (i) that its use of the Trademarks and all products and services offered in connection with the Trademarks by Licensee and its Franchisees shall be of a nature and quality commensurate with the current standards and reputation for quality of corresponding products and services being offered under the Trademarks as of the Effective Date, and in accordance with trademark usage guidelines and rules promulgated by Licensor from time to time; (ii) that the provision of the Franchise Services shall be in accordance with all applicable laws; and (iii) that the provision of such services shall not reflect adversely upon the Trademarks.

(b)    Notwithstanding Licensee's rights set forth in Section 7(d), if Licensor determines in its reasonable judgment that any advertising or promotional programs or materials used or planned by Licensee or its Franchisees are directly or indirectly injurious or prejudicial to the Trademarks, Licensee shall cease or cause the cessation of such advertising or promotion within a reasonable period following receipt of notification from Licensor.

5.    **Licensor's Ownership and Protection of Licensor's Rights**.

(a)    Licensee recognizes the great value of the goodwill associated with the Trademarks, and acknowledges that, as between Licensor, Licensee and the Sublicensees (as defined herein), subject to the terms of this License, all rights therein and the goodwill appurtenant thereto belong exclusively to Licensor.

(b)    Licensee acknowledges that, as between the parties, Licensor owns all legal right, title and interest in and to the Intellectual Property.  Licensee agrees that all use of the Intellectual Property, pursuant to the terms hereof, and any goodwill resulting from such use, shall inure solely to the benefit of Licensor.

(c)    Licensee agrees to cooperate fully and in good faith with Licensor, at Licensee's expense, for the purpose of securing and preserving Licensor's rights in and to the Intellectual Property, including but not limited to, executing any documents and taking any actions at Licensor's reasonable request to confirm Licensor's legal title in and to the Intellectual Property. Licensee will cooperate with Licensor and will, at Licensor's reasonable request, take any actions requested by Licensor, at Licensee's expense, in connection with the filing and prosecution by Licensor of applications in Licensor's name to register the Intellectual Property and in connection with the maintenance and renewal of such registrations as may issue.

(d)    Licensee agrees to cooperate fully with Licensor in the protection and enforcement of the Intellectual Property.  Licensor may, in its sole discretion, commence or

prosecute and effect the disposition of any claims or suits relative to the imitation, infringement, dilution, misappropriation and/or unauthorized use of the Intellectual Property, either in its own name, or in the name of Licensee, or join Licensee as a party in the prosecution of such claims or suits.  Licensee agrees to, at Licensee's expense, cooperate fully with Licensor in connection with any such claims or suits and undertakes to furnish full assistance to Licensor in the conduct of all proceedings in regard thereto.  Licensee shall promptly notify Licensor of any infringements, imitations, dilution, misappropriation or unauthorized uses by others of the Intellectual Property of which Licensee has actual knowledge.  Licensor shall in its sole discretion have the right to settle or effect compromises in respect thereof, using counsel of its choice.  Licensee shall not institute any suit or take any action on account of such infringements, imitations, dilutions, misappropriations or unauthorized uses, without Licensor's prior consent.  Notwithstanding the foregoing, if Licensor elects not to prosecute any infringement, imitation, dilution, misappropriation or unauthorized use of the Intellectual Property which substantially affects the rights granted to Licensee hereunder and Licensee reasonably deems it necessary to do so to protect any of its rights hereunder, Licensee may, at Licensee's expense, institute any suit or take any action reasonably necessary to abate such infringement, imitation, dilution, misappropriation or other unauthorized use and may retain all settlements, damages or proceeds relating thereto.  Licensee shall not initiate any such suit or action, or take any action in such suit or action which in any way jeopardizes or brings into question the validity of the Intellectual Property.  Any settlement involving or in any way related to the Intellectual Property shall be subject to the prior approval of Licensor, which approval shall not be unreasonably withheld.

(e)     Licensee agrees that it will not during the Term, or thereafter, challenge or attack the ownership or any other rights of Licensor in and to the Intellectual Property or challenge or attack the validity of this Agreement.

6.     **Intellectual Property Hereafter Developed**.

(a)     If Licensee wishes to use or authorize the use of the Intellectual Property, or any portion thereof, in connection with a new product or service relating to the Franchise Services or if Licensee wishes to develop new intellectual property in connection with the Franchise Services, it shall first receive approval from Licensor prior to initiating, or authorizing its Franchisees to initiate, such new product or service or the use of such new intellectual property. Licensor's approval shall not be unreasonably withheld, conditioned or delayed by Licensor.  In determining whether to grant such approval, Licensor may take into consideration the potential for the new product or service to tarnish the image of or adversely affect the value of the Intellectual Property including, without limitation, the indiscriminate proliferation of uses of the Trademarks which would cause the Trademarks to lose significance as a source of origin.

(b)     All innovations, changes, adaptations and derivative works related to the Intellectual Property ("Innovations") are the sole and exclusive property of Licensor and shall be deemed works made-for-hire.  To the extent any Innovation does not qualify as a work made-for-hire, Licensee hereby assigns ownership of that Innovation, and all intellectual property and other rights to the Innovation, to Licensor and agrees to sign and deliver such instruments and documents, provide such assistance and perform such other acts as Licensor periodically designates in order for it or its designee to obtain exclusive rights in such Innovations.  Licensor shall have no obligation to make any lump sum or other payments to Licensee or any other person

with respect to any such Innovations.  Licensee will not use, nor will it allow any other person to use, any such Innovations, whether in connection with a Fitness Club or otherwise, without obtaining Licensor's prior written approval.

       7.     **Sublicensing.**

       (a)     Licensee may sublicense the Intellectual Property in the ordinary course of business in connection with the Franchise Services, to (i) its affiliates, (ii) a party to a Franchise Agreement pursuant to which such party is licensed to operate a Fitness Club, and (iii) third parties as necessary to advertise and promote the Fitness Clubs, including, without limitation, to fulfill Licensee's advertising obligations pursuant to Franchise Agreements (each of the authorized sublicensees hereunder, a "Sublicensee").  Licensee acknowledges and agrees that the licenses granted to Sublicensees pursuant to the foregoing clause shall not include the right for such Sublicensees to further sublicense the Intellectual Property.  Licensee must obtain Licensor's prior approval, not to be unreasonably withheld, conditioned or delayed, to grant any other right to use the Intellectual Property.  Licensee agrees that the provisions contained in each agreement entered into with a Sublicensee shall not contravene the provisions contained herein.

       (b)     Each Franchise Agreement and any other agreement entered into by Licensee with a Sublicensee with respect to the Intellectual Property shall contain provisions to ensure and/or maintain the ownership, validity, enforceability and strength of the Intellectual Property and the goodwill appurtenant thereto, in all material respects similar to such provisions contained in the Franchise Agreement, except that ownership of the Intellectual Property vests in Licensor.

       (c)     Prior to entering into or authorizing any amendment to a Franchise Agreement or entering into any other agreement with a Sublicensee, Licensee shall submit to Licensor for Licensor's prior approval any proposed material change to the Franchise Agreement form which relates to the use or reputation of the Intellectual Property, such approval not to be unreasonably withheld, conditioned or delayed.  Licensor's approval for the purposes of this Section 7(c) shall be deemed to have been given unless Licensor provides written notice to the contrary setting forth the basis of such disapproval to Licensee in writing within three (3) days after Licensor receives Licensee's submission of each proposed change to the Franchise Agreement form.

       (d)     Licensee shall take such actions as it shall reasonably deem appropriate under the circumstances, in accordance with its reasonable business judgment, to enforce, or cause the enforcement of, the provisions of each Franchise Agreement which relates to the use or reputation of the Intellectual Property in order to protect and maintain Licensor's rights in the Intellectual Property, including the ownership and validity thereof.

       8.     **Confidentiality**.  Licensor and Licensee acknowledge that during the Term each party may receive Confidential Information from the other party.  Each party agrees, both during and after the Term, to maintain the Confidential Information in the strictest of confidence and will not, at any time, use, disseminate or disclose any Confidential Information to any person or entity other than those of its employees or representatives who have a "need to know", who have been apprised of this restriction and who are themselves bound by similar nondisclosure restrictions.

Recipient shall be liable for any breach of this Section 8 by any of its employees or representatives and shall immediately notify Discloser in the event of any loss or disclosure of any Confidential Information.  Upon termination of this Agreement, Recipient will return to Discloser or, at Discloser's request, destroy, all documents and records in its possession containing the Confidential Information of Discloser.  Confidential Information shall not include information that: (i) is already known to Recipient without restriction on use or disclosure prior to receipt of such information from Discloser, (ii) is or becomes part of the public domain other than by breach of this Agreement by, or other wrongful act of, Recipient; (iii) is developed by Recipient independently of and without reference to any Confidential Information; or (iv) is received by Recipient from a third party who is not under any obligation to Discloser to maintain the confidentiality of such information.  The prohibitions on disclosure of Confidential Information shall not apply to any such information which is required to be disclosed by applicable law, statute, rule, regulation, subpoena, court order or legal process; provided that the Recipient shall promptly inform the Discloser of any such requirement and cooperate with any attempt by the Discloser to obtain a protective order or other similar treatment.  It shall be the obligation of Recipient to prove than such an exception to the restrictions on the use of Confidential Information exists.

9.    **Indemnity**.

(a)    Licensor will indemnify, defend at its expense and hold Licensee harmless from and against, any and all losses, damages, liabilities, settlements, judgments, reasonable attorneys' fees, expenses or costs ("Losses") incurred by Licensee as a result of any third-party claims arising from any breach by Licensor of any of the terms or conditions of this Agreement.

(b)    Licensee will indemnify, defend at its expense and hold Licensor harmless from and against, any and all Losses incurred by Licensor as a result of any third-party claims arising from the business, operations or products of Licensee and/or any Sublicensee, or Licensee's and/or any Sublicensee's unauthorized use of the Intellectual Property to the extent not arising from a breach of Licensor's obligations hereunder.

10.    **Assignability.** This Agreement may be not be assigned by either party without the prior written consent of the other party.

11.    **Payment**.  Simultaneously with the execution and delivery of this Agreement, in consideration for the license hereunder, Licensee shall pay to Licensor a one-time license fee of $15,000.00 to be paid within 18 months from the effective date.

12.    **Miscellaneous**.

(a)    Execution in Counterparts; Severability.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.  In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(b)        GOVERNING LAW; WAIVER OF JURY TRIAL.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.  THE PARTIES HERETO HEREBY DECLARE THAT IT IS THEIR INTENTION THAT THIS AGREEMENT SHALL BE REGARDED AS MADE UNDER THE LAWS OF THE STATE OF CALIFORNIA AND THAT THE LAWS OF SAID STATE SHALL BE APPLIED IN INTERPRETING ITS PROVISIONS IN ALL CASES WHERE LEGAL INTERPRETATION SHALL BE REQUIRED.  EACH OF THE PARTIES HERETO HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(c)        Survival.   The following provisions shall survive the expiration or termination of this Agreement:  Sections 1, 5(a), (b)and (e), 8, 9, 12 and Sections 5(c) and (d) (with respect to any actions commenced prior to termination).

(d)        Binding Effect.  This Agreement shall be binding upon and inure solely to the benefit of the parties, their respective successors and assigns.  Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person other than the parties hereto and their respective successors and assigns any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained.

(e)        Waivers; Amendments.  No failure or delay on the part of Licensor or Licensee or any assignee thereof, in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy.  The rights and remedies herein provided shall be cumulative and nonexclusive of any rights or remedies provided by law.  Any provision of this Agreement may be amended only if executed by the parties hereto in writing.

(f)        Headings.  The headings in the sections of this Agreement are inserted for convenience of reference only and shall not be deemed a part of this Agreement.

(g)        Entire Agreement.   This Agreement, together with the exhibits and schedules hereto, contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all previous oral statements and other writings with respect thereto.

(h)        Relationship of Parties.  Nothing herein contained shall be construed to constitute the parties hereto as partners or as joint venturers, or either as agent of the other, and neither party shall have any power to obligate or bind the other party in any manner whatsoever.

(i)        Notices.  All notices, requests or other communications required to be given in writing under this Agreement shall be sent by (i) certified or registered mail, return receipt requested, postage prepaid, (ii) national prepaid overnight delivery service, (iii) telecopy or other facsimile transmission (following with hard copies to be sent by national prepaid overnight delivery service) or (iv) personal delivery with receipt acknowledged in writing, as follows:

if to Licensor:

F-19 Holdings, LLC
14670 NE 8th St., Suite 205
Bellevue, WA 98007-4127
Attention: Nick Milat V.P.
Fax: (253) 639-1927


if to Licensee:

F19 Franchising, LLC
32605 Temecula Parkway, Suite 308
Temecula, CA 92592
Attention:  CFO and General Counsel
Fax: 951-587-2580


Either party may change its address for notices hereunder by giving notice of such change to the other party.  All notices and demands shall be deemed to have been given either at the time of the delivery thereof to any officer or manager of the party entitled to receive such notices and demands at the address of such party for notices hereunder, or on the third day after the mailing thereof to such address, as the case may be.

        IN  WITNESS  WHEREOF  the  parties  have  executed  this  Intellectual  Property License Agreement as of the date first set forth above.

**F-19 HOLDINGS, LLC**

By: _____
Name: Nick Milat
Its:   Vice President

**F19 FRANCHISING, LLC**

By: _____
Name:  Nick Milat
Its:   Secretary

8

**Schedule 1**
**To**
**Intellectual Property License Agreement**

| Mark | Registration Number |
|------|---------------------|
| Fitness 19 | Registered on Principal Register on July 13, 2004, bearing Registration Number 2863684 |
| Fitness 19 and Design | Registered on Principal Register on October 12, 2004, bearing Registration Number 2893882 |
| 19 and Design | Registered on Principal Register on September 25, 2012, bearing Registration Number 4212994 |

**INTELLECTUAL PROPERTY LICENSE AGREEMENT**

**Dated as of January 1, 2009**

**between**

**F-19 HOLDINGS, LLC**

**and**

**F19 FRANCHISING, LLC**

## <u>TABLE OF CONTENTS</u>

<u>Page #</u>

1. Certain Definitions .................................................................................................1
2. Grant of License ...................................................................................................2
3. Term and Termination ..........................................................................................2
4. Quality Control .....................................................................................................3
5. Licensor's Ownership and Protection of Licensor's Rights .................................3
6. Intellectual Property Hereafter Developed ..........................................................4
7. Sublicensing ........................................................................................................5
8. Confidentiality ......................................................................................................5
9. Indemnity .............................................................................................................6
10. Assignability .........................................................................................................6
11. Payment ...............................................................................................................6
12. Miscellaneous ......................................................................................................6

# EXHIBIT O

# F19 FRANCHISING, LLC

# FRANCHISE AGREEMENT
(Amended Version for Senior Partner Clubs)

**ENDO Fitness Moorpark, LLC**
FRANCHISEE NAME

**November 26, 2019**
EFFECTIVE DATE OF AGREEMENT

**543 West Los Angeles Avenue**
**Moorpark, CA 93021**

ADDRESS OF FITNESS CLUB

**ENDO Fitness Moorpark, LLC**
FITNESS CLUB NAME

**N/A**
STORE NUMBER

**TABLE OF CONTENTS**

Page

A.   GRANT OF LICENSE. ............................................................................................ 1
   1.   Grant. ............................................................................................................ 1
   2.   Term. ............................................................................................................ 1
   3.   Territorial Rights and Restrictions. .............................................................. 1
   4.   Overlapping Areas. ....................................................................................... 2
   5.   Reservation of Rights. .................................................................................. 2
   6.   Pricing & Pricing Disputes. .......................................................................... 3
B.   YOUR OBLIGATIONS TO DEVELOP THE FITNESS CLUB. ............................ 3
C.   FEES. ....................................................................................................................... 3
   1.   Initial Fee. .................................................................................................... 3
   2.   Monthly Fee. ................................................................................................ 3
   3.   Operations Fee and Capital Event Fee. ........................................................ 4
   4.   Technology Services. .................................................................................... 4
   5.   Electronic Funds Transfer. ........................................................................... 4
   6.   Interest on Delinquent Payments. ................................................................ 5
D.   MARKS. ................................................................................................................... 5
   1.   Right to Use Marks. ...................................................................................... 5
   2.   Rules for the Use of Marks. .......................................................................... 5
   3.   Use of the Internet. ....................................................................................... 5
   4.   Notification and Defense of Claims. ............................................................ 5
   5.   Indemnification by Us. ................................................................................. 5
E.   OPERATION OF THE FITNESS CLUB AND SYSTEM STANDARDS. ............. 6
   1.   Operation of the Fitness Club. ...................................................................... 6
   2.   Consistency of Operations. ........................................................................... 6
F.   TERMINATION OF AGREEMENT ........................................................................ 7
   1.   Termination by You. ..................................................................................... 7
   2.   Termination by Us. ....................................................................................... 7
G.   EFFECT OF TERMINATION OF THIS AGREEMENT ......................................... 7
H.   RELATIONSHIP OF THE PARTIES; INDEMNIFICATION. ................................ 8
   1.   Independent Contractors. .............................................................................. 8
   2.   Taxes. ........................................................................................................... 8
   3.   Indemnification. ........................................................................................... 8
I.   STANDARD CLAUSES. .......................................................................................... 9
   1.   Amendments; Waivers. ................................................................................. 9
   2.   Entire Agreement. ......................................................................................... 9
   3.   Costs and Attorneys' Fees. ........................................................................... 9
   4.   No Off-Sets; Cumulative Rights. .................................................................. 9
   5.   Arbitration. ................................................................................................... 9
   6.   Governing Law. ............................................................................................ 10
   7.   Consent to Jurisdiction. ................................................................................ 10
   8.   Waiver of Punitive Damages. ....................................................................... 11
   9.   Limitations of Claims. .................................................................................. 11
   10.  Notices and Payments. ................................................................................. 11
J.   DEFINITIONS. ........................................................................................................ 11
K.   ACKNOWLEDGMENTS. ........................................................................................ 12

## FRANCHISE AGREEMENT
### (Amended Version for Senior Partner Clubs)

**THIS FRANCHISE AGREEMENT** ("**Agreement**") is made effective as of the November 26, 2019 (the "**Effective Date**"), regardless of when the parties execute and date this Agreement, by and between **F19 Franchising, LLC**, a California limited liability company whose principal business address is 4810 Point Fosdick Dr. #7, Gig Harbor, WA 98335 ("**us**", "**we**", or "**our**"), and **ENDO Fitness Moorpark, LLC**, a California limited liability company whose principal business address is as shown on the signature page hereof ("**you**").

Our Affiliate, F-19 Holdings, LLC ("**Holdings**"), owns the trademarks and service marks "Fitness 19®" and other specified commercial symbols (collectively, the "**Marks**") that are used to identify certain health and fitness centers (each, a "**Fitness 19® Fitness Center**"). Holdings has granted us the right to sublicense the Marks to Fitness 19® Fitness Centers.

In this Agreement, the Fitness 19® Fitness Center in which you are licensed to use the Marks is referred to as the "**Fitness Club**." Other defined terms are found throughout this Agreement.

If your Fitness Club has operated prior to the Effective Date, you and we acknowledge and agree that this Agreement is intended to replace any oral licenses or permissions, however evidenced, pursuant to which your Fitness Club has used the Marks prior to the Effective Date, and that the use of the Marks by your Fitness Club from and after the Effective Date will be governed by this Agreement.

In consideration of the undertakings and commitments set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## A.    GRANT OF LICENSE.

1.    <u>Grant</u>.    Subject to the terms, conditions and limitations set forth in this Agreement, we grant you a license ("**License**") to use the Marks in connection with the development, ownership, operation and promotion of the Fitness Club located or to be located at: <u>543 West Los Angeles Avenue, Moorpark, CA 93021</u>.

2.    <u>Term</u>.    The term of the License (the "**Term**") will begin on the Effective Date and will continue for an initial term of ten (10) years, unless terminated earlier under the terms of this Agreement. Upon the expiration of the initial term or any successor term, the term of this Agreement shall be automatically extended for successive ten (10) year renewal terms.

3.    <u>Territorial Rights and Restrictions</u>.    Except as provided in this Section A.3, in Sections A.4 and A.5, we agree that we will not, during the Term and without your prior written consent, use or grant a license to anyone else to use the Marks in connection with the operation of a Fitness 19® Fitness Center within a circle having the Fitness Club as its center and a radius of six (6) miles (the "**Protected Area**"). You agree that your right to use the Marks in connection with the operation and promotion of the Fitness Club under this Agreement is restricted to the Protected Area and that you will not use the Marks outside of the Protected Area (however, this shall not apply to use of the Marks on the Internet and/or social media as and to the extent permitted under Section D.3). You also agree that you will not use the Marks within the exclusive territory (if any) granted by us to any person or entity. Use of the Marks shall

1

include, but is not limited to, advertising, flyering, marketing, membership sales, setting up a kiosk, or any other advertising/marketing activity that shall encroach upon the exclusive territory of another. Unless otherwise agreed to between the Fitness Club and another Fitness 19® Fitness Center, you agree that all membership sales shall be limited to access to the Fitness Club and shall not include access to any other Fitness 19® Fitness Center.

4.    Overlapping Areas. You acknowledge that portions of the Protected Area may lie within the protected areas previously granted to other Fitness 19® Fitness Centers existing as of the Effective Date (each an "Existing Center") and that a portion of the protected areas granted to such Existing Centers may lie within your Protected Area (such areas referred to as "Overlapping Areas"). You agree that the exclusivity granted in Section A.3 will not apply with respect to any such Overlapping Areas, however, you agree that no advertising, marketing, promotion or membership sales shall occur more than three (3) miles from the Fitness Club in an Overlapping Area. You also agree that, should the owner of an Existing Center assert that your use of the Marks in an Overlapping Area is a violation of its rights with respect to the Overlapping Area, you will resolve such assertion directly with the owner of such Existing Center and will defend and hold us and Holdings harmless with respect to such assertions made by the Existing Center. You also acknowledge and agree that, although we reserve the right to enforce this section, neither we nor Holdings shall have a duty or obligation to take action against any owner of any Existing Center who uses the Marks in your Protected Area. You further acknowledge that this provision and similar provisions in all other franchise or license agreements with other owners of Fitness 19® Fitness Centers ("**Other Franchise Agreements**") are for the benefit of the entire system of Fitness 19® Fitness Centers. This provision is intended to create, and you agree that it does create, an obligation and a duty not only to us but to each other owner of a Fitness 19® Fitness Center. Therefore, each other owner of a Fitness 19® Fitness Center is a third-party beneficiary of this provision, and you are a third-party beneficiary of similar provisions in all Other Franchise Agreements. As third-party beneficiary, you and each other Fitness 19® Fitness Center owner are authorized to enforce this provision and the similar provision in any Other Franchise Agreement with respect to your Protected Area. You agree that your sole remedy in the event another Fitness 19® Fitness Center encroaches upon your Protected Area is to seek injunctive and/or equitable relief against such other Fitness 19® Fitness Center owner and not against us or Holdings. However, prior to resorting to legal action, you agree to send a written notice to the breaching Fitness 19® Fitness Center owner (with a courtesy copy to us), by certified mail, of its alleged encroachment and to provide it with a 10-day period within which to cease activities in your Protected Area.

5.    Reservation of Rights. We grant rights only by expressed written provisions in this Agreement or other written agreements and not by implication. We reserve, for ourselves and our Affiliates, all rights which are not expressly granted to you in this Agreement. Without limitation and without regard to proximity to the Fitness Club, we and our Affiliates reserve the right, on such terms and conditions as we deem appropriate, ourselves or through authorized third parties (including our Affiliates), to:

(a)    own, establish, operate, and license and/or franchise others to own, establish and operate Fitness 19® Fitness Centers anywhere in the world other than the Protected Area, whether under the Marks or other trademarks; and

(b)    engage in any other activities not expressly prohibited in this Agreement.

2

6. <u>Pricing & Pricing Disputes</u>. We are under no obligation to set, monitor, or resolve differences in pricing rates, plans, and/or schedules for the Fitness Club or for any other Fitness 19® Fitness Centers. Pricing shall be determined by the Fitness Club. The Fitness Club shall have the right to offer a "Multi-Club Membership Price" in accordance with any agreement entered into between the Fitness Club and any other Fitness 19® Fitness Centers. From and after the Effective Date, the Fitness Club shall not offer an "All Club Access Membership Price." While we reserve the right to intervene and attempt to resolve any pricing disputes between you and other Fitness 19® Fitness Centers, neither we nor Holdings shall be liable for any pricing disputes that arise between you and another Fitness 19® Fitness Center nor shall we or Holdings be obligated to enforce any similar obligation of any other Fitness 19® Fitness Centers to follow and abide by pricing rates, plans, and/or schedules. You agree that this provision and similar provisions in all Other Franchise Agreements are for the benefit of the entire system of Fitness 19® Fitness Centers and that this provision is intended to create, and you agree that it does create, an obligation and a duty not only to us but to each other owner of a Fitness 19® Fitness Center. Therefore, each other owner of a Fitness 19® Fitness Center is a third-party beneficiary of this provision, and you are a third-party beneficiary of similar provisions in all Other Franchise Agreements. As third-party beneficiary, you and each other Fitness 19® Fitness Center owner are authorized to enforce this provision and the similar provision in any Other Franchise Agreement. You agree that your sole remedy in the event another Fitness 19® Fitness Center fails to follow and abide by any agreed to "Multi-Club Price" or if another Fitness 19® Fitness Center offers or implements an "All Club Access Membership Price," is to seek injunctive and/or equitable relief against such other Fitness 19® Fitness Center owner and not against us or Holdings. However, prior to resorting to legal action, you agree to send a written notice to the breaching Fitness 19® Fitness Center owner (with a courtesy copy to us), by certified mail, of its alleged failure and to provide it with a 10-day period within which to comply.

**B.** <u>**YOUR OBLIGATIONS TO DEVELOP THE FITNESS CLUB.**</u>

You have the sole obligation to develop and open your Fitness Club in accordance with all applicable laws, ordinances and regulations, including, without limitation, the Americans with Disabilities Act (the "**ADA**") and similar rules governing public accommodations for persons with disabilities, and all other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions.

**C.** <u>**FEES.**</u>

1. <u>Initial Fee</u>. You agree to pay us a fee (the "**Initial Fee**") of Ten Thousand Dollars ($10,000). The Initial Fee shall be paid in equal monthly payments of $166.67 over a five (5) year period with no interest. The first monthly payment will be due on the fifth (5th) calendar day of the third (3rd) calendar month following the opening of the Fitness Club regardless of the day of the month upon which such date falls. All subsequent monthly payments are due on the fifth (5th) calendar day of each successive month during the five (5) year period (each a "**Due Date**"). This Initial Fee is consideration for the grant of the license to use the Marks, is fully earned by us when you and we sign this Agreement, and is not refundable in whole or in part.

2. <u>Monthly Fee</u>. You also agree to pay us a monthly fee of One Hundred Dollars ($100) (the "**Monthly Fee**") for the on-going right to use the Marks. The first Monthly Fee will be due on the fifth (5th) calendar day of the third (3rd) calendar month following the opening of the Fitness Club regardless of the day of the month upon which such date falls. All subsequent

3

monthly payments are due on the fifth (5th) calendar day of each successive month during the Term (each a "**Due Date**").

3.     Operations Fee and Capital Event Fee.  If Holdings does not own an interest in you, then, in addition to the Initial Fee and the Monthly Fee set forth above, you agree to pay us: (a) 10% of the Net Cash Flow from Operations (as defined below) from the operation of the Fitness Club (the "**Operations Fee**"); and (b) 10% of the Net Proceeds (defined below) from a Capital Event (defined below); provided, however, that if Holdings guaranties the lease of the Fitness Club, the Operations Fee will automatically increase to 20% of Net Cash Flow from Operations and the percentage of Net Proceeds from a Capital Event will automatically increase to 20%. Moreover, your Managing Member, in your Managing Member's sole and absolute discretion, shall have the right, but not the obligation, to offer a percentage of the Net Cash Flow from Operations to the individual members of Holdings pursuant to a Consultant Agreement. Your obligation to pay the Operations Fee commences when the Fitness Club first begins to derive Net Cash Flow from Operations. Thereafter, your payment of the Operations Fee to us shall be at the same time and manner as payments of Net Cash Flow from Operations are paid to any person or member of you, which is typically set forth on a written allocation sheet (or company split sheet). Payment of the Operations Fee shall be made in good faith and shall not be unreasonably withheld.

"**Net Cash Flow from Operations**" means your cash revenue from all sources (other than from sale of assets, borrowings and investment or Capital Events) less (i) all payments for the service of debt, other obligations and expenses in the ordinary course of business and (ii) maintenance of a cash reserve for taxes, capital expenditures and your other needs as shall reasonably be determined from time to time by you.

"**Net Proceeds**" shall mean the remaining amount of any proceeds after your creditors have been paid and a reserve amount has been set by your management (with consultation from us) in an amount which they deem reasonably necessary for any of your contingent or unforeseen liabilities or obligations.  A "**Capital Event**" means any liquidation or winding up of you, any sale or other disposition of all or substantially all of your assets, or any other sale of any of your assets other than in the ordinary course of business.

4.     Technology Services.  You agree to pay us a recurring technology fee (the "**Technology Fee**") in connection with website and search-engine optimization services and any other technology services (collectively, "**Technology Services**") that we may provide (or authorize third parties to provide) from time to time and that you elect to use. Based on the Technology Services that you elect to use, you and we will mutually agree to the amount of the Technology Fee. We use the Technology Fee to reimburse us for the costs we incur in contracting with the third parties that provide the Technology Services, and we will not obtain a profit from our collection of the Technology Fee. We will provide, on your written request, a statement detailing the costs we have incurred in providing the Technology Services. You acknowledge and agree that we are not obligated to provide Technology Services.

5.     Electronic Funds Transfer.  You must sign and deliver to us the documents we periodically require to authorize us to debit your checking account automatically for the Initial Fee and Monthly Fee (beginning with the first Initial Fee and Monthly Fee payment due under this Agreement) and the Technology Fee.  You agree to make the funds available for withdrawal by electronic funds transfer before each Due Date. We may periodically change the mechanism for your payments of Monthly Fees and other amounts you owe to us under this Agreement.

4

6.    Interest on Delinquent Payments.  Any amounts owed us under this Agreement that are not paid by their due date shall bear interest, from the due date until our receipt, at the lesser of 9.9% per annum or the highest commercial contract rate of interest permitted by law.

## D.    MARKS.

1.    Right to Use Marks.  Your right to use the Marks is derived solely from this Agreement.  The Marks are owned by Holdings.  You agree that neither you nor your Owners will ever (during or after the Term) challenge Holdings' exclusive rights to the Marks or engage in conduct which may materially adversely affect our reputation, your reputation, or the reputation of the Fitness Club.  Your usage of the Marks will be exclusively for our and Holdings' benefit, which means that you have no right to the Marks other than the right to use the Marks as provided in this Agreement.  All provisions of this Agreement applicable to the Marks apply to all proprietary trademarks, service marks, and commercial symbols we authorize you to use during the Term.

2.    Rules for the Use of Marks.  You must use the Marks (and only the Marks) as the sole identification of the Fitness Club.  You are authorized to use the Marks only in accordance with our trademark usage guidelines (if any) as they might be revised from time to time.  Unless we approve otherwise, in writing, you may not use the Marks or any abbreviations thereof outside the Protected Area.  All advertising, promotion, and marketing you conduct must be legal and not misleading.

3.    Use of the Internet.  Unless otherwise agreed to by us upon your request, you may not use or authorize the use of any Mark or any abbreviations thereof (e.g., "Fitness 19") as part of any domain name, electronic address, meta tag, website or otherwise on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system.  Neither you nor your Owners may develop, maintain or authorize any website or other online presence or other electronic medium (including, without limitation, on social media or networking sites) that mentions, identifies or describes the Fitness Club or displays any of the Marks.  Nothing in this Section shall limit our right to maintain websites or to offer and sell merchandise bearing the Marks from a website or otherwise over the internet without payment or obligation of any kind to you.

4.    Notification and Defense of Claims.  You will notify us promptly of any claim by others (a) that you are infringing their trademark rights in connection with your use of the Marks or (b) to any rights in the Marks which are inconsistent with this Agreement or our and Holdings' exclusive rights to the Marks.  You will fully cooperate with us and Holdings with respect to our or its prosecution of any infringement claim or our defense of a claim that you are infringing the trademark rights of any third party.  We and/or Holdings have the exclusive right to control any such prosecution or defense.

5.    Indemnification by Us.  Provided you comply with the provisions of this Section D, we will indemnify, defend, and hold harmless you and your Owners, directors, officers, employees, agents, successors, and assignees (collectively, the "**Licensee Indemnified Parties**") against, and reimburse all of the Licensee Indemnified Parties for, any claims asserted against or incurred by the Licensee Indemnified Parties in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement if you have timely notified us of the proceeding and comply with our reasonable directions in responding to the

F19 Franchising, LLC
2019 FDD | Ex. B - Franchise Agreement

proceeding. Notwithstanding the foregoing, we will not indemnify, defend or hold harmless the Licensee Indemnified Parties for any unauthorized use of the Marks. We may control the defense of any proceeding arising from your use of any Mark under this Agreement. This indemnification will continue in full force and effect notwithstanding this Agreement's termination or expiration.

## E.    **OPERATION OF THE FITNESS CLUB AND SYSTEM STANDARDS.**

1.      <u>Operation of the Fitness Club</u>.  You alone are responsible for staffing and operating the Fitness Club, and agree to operate the Fitness Club, in full compliance with all applicable laws, ordinances and regulations (including, without limitation, bonding and licensing requirements) and using commercially reasonable efforts to promote and enhance the business of the Fitness Club and the goodwill associated with the Marks generally. We are under no obligation to provide you with, and will not provide you with, a marketing or other advertising plan or operating system. You will prominently display in the Fitness Club and in other written materials that are available or visible to the general public statements identifying you as the independent owner of the Fitness Club and our authorized licensee. You must inform your employees and independent contractors that their relationship is solely with you and that they are not employed by us or any of our Affiliates (except you if you are an Affiliate).

2.      <u>Consistency of Operations</u>.  The goodwill associated with the Marks and the Fitness 19 brand will be enhanced by all Fitness 19® Fitness Centers adhering to certain brand standards and operating ethically, honestly, and consistently.  In that regard, you agree as follows:

(a)      <u>Strategic Alliances</u>.  We may, from time to time, with your approval, establish one or more strategic alliances or preferred vendor programs with nationally or regionally known gym equipment vendors.

(b)      <u>Compliance With Laws</u>.  You must secure and maintain in force throughout the Term all required licenses, permits and certificates relating to the operation of your Fitness Club and operate your Fitness Club in full compliance with all applicable laws, ordinances and regulations, including, without limitation, PCI compliance standards. You agree to comply and assist us in our compliance efforts, as applicable, with any and all laws, regulations, Executive Orders or otherwise relating to anti-terrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury or other regulations.  In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Fitness Club as may be required by us or by law. You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section H.3 pertain to your obligations hereunder.

(c)      <u>Ethical Conduct</u>.  Your Fitness Club must in all dealings with its members, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which might injure our business or the goodwill associated with the Marks or other Fitness 19® Fitness Centers. You must notify us in writing within three business days of: (1) the commencement of any action, suit or proceeding relating to your Fitness

6

Club; (2) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality relating to your Fitness Club; (3) any notice of violation of any law, ordinance or regulation relating to your Fitness Club; and (4) receipt of any notice of complaint from any local, state or federal consumer affairs department or division, or any other government agency involving a complaint from a client or potential client relating to your Fitness Club. You must immediately provide to us copies of any documentation you receive of events in (1) through (4) above and resolve the matter in a prompt and reasonable manner in accordance with good business practices.

## F.   TERMINATION OF AGREEMENT

1.   <u>Termination by You</u>. You may terminate this Agreement if we commit a material breach of any of our obligations under this Agreement and fail to correct such breach within 30 days after your delivery of written notice to us of such breach; provided, however, that if we cannot reasonably correct the breach within this 30-day period but provide you, within this 30-day period, with reasonable evidence of our effort to correct the breach within a reasonable time period, then the cure period shall run through the end of such reasonable time period.

2.   <u>Termination by Us</u>. Upon the occurrence of any one of the following events, we may, at our option, terminate this Agreement, effective immediately upon delivery of written notice to you:

(a)   you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or a substantial part of your property; the Fitness Club is attached, seized, or levied upon, unless such attachment, seizure, or levy is vacated within 60 days; any order appointing a receiver, trustee, or liquidator of you or the Fitness Club is not vacated within 60 days following the entry of such order; or you file articles of dissolution or otherwise cease to exist as a limited liability company or other legal entity; or

(b)   you fail to comply with any other material obligation under this Agreement and do not correct the failure to our satisfaction within 30 days after we deliver written notice of the failure to you; provided, however, that if you cannot reasonably correct the breach within this 30-day period but provide us, within this 30-day period, with reasonable evidence of your effort to correct the breach within a reasonable time period, then the cure period shall run through the end of such reasonable time period.

## G.   EFFECT OF TERMINATION OF THIS AGREEMENT.

Upon termination of this Agreement for any reason, and as soon as reasonably practicable, you will immediately: (i) close the Fitness Club for business to members, (ii) cease all use of the Marks, and (iii) de-identify the premises of the Fitness Club to remove all Marks and other indication that it formerly operated as part of the Fitness 19 system. In addition to any procedures required by state law, you must also take all commercially reasonable efforts to notify all of your members of the termination or expiration of this Agreement and offer to such members the option to terminate their membership and receive a pro rata refund of all membership fees and other charges which were prepaid by such members related to any period after the effective date of termination or expiration of this Agreement. All of our and your (and

7

your Owners' and Affiliates') obligations which expressly or by their nature survive the termination or expiration of this Agreement will continue in full force and effect subsequent to and notwithstanding its termination or expiration until such obligations are satisfied in full or by their nature expire.

## H.   RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.

1.   <u>Independent Contractors</u>.  This Agreement does not create a fiduciary relationship between you and us.  We and you are and will be independent contractors, and nothing in this Agreement is intended to create an agency, joint venture, partnership, or employment relationship.  Neither party has any right to create any obligation on behalf of the other except as expressly provided in this Agreement.

2.   <u>Taxes</u>.  You and your Owners are solely responsible for all taxes, however denominated or levied upon you or the Fitness Club, in connection with the business you will conduct under this Agreement (except any taxes we are required by law to collect from you with respect to purchases from us).

3.   <u>Indemnification</u>.

(a)    You will indemnify, defend, and hold us, our Affiliates, and our and their respective owners, directors, managers, officers, employees, agents, successors, and assignees (collectively, "**Indemnified Parties**") harmless against, and reimburse any one or more of the Indemnified Parties for, all third party claims, any and all taxes, and any and all claims and liabilities directly or indirectly arising out of: (i) the operation of the Fitness Club; (ii) your use of the Marks in an Overlapping Area (as described in Section A.4); (iii) any pre-sale activities; (iv) the unauthorized use of the Marks; and (v) a breach of this Agreement.

However, your indemnification obligations under this Section H.3.(a) will not apply to, and we will reimburse you for any defense costs, including attorneys' fees, that you incurred on behalf of any Indemnified Party with respect to, claims or liabilities which are determined to be caused solely by the Indemnified Party's negligence, material defaults or willful misconduct in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction.  Each Indemnified Party has the right to defend any claim at your expense if you fail to defend the claim in a commercially reasonable manner.  This indemnity will continue in full force and effect notwithstanding the termination or expiration of this Agreement.

(b)    We agree to indemnify, defend, and hold harmless you and your Owners, directors, officers, employees, agents, successors, and assignees (collectively, "**Licensee Owner Indemnified Parties**") against, and to reimburse each Licensee Owner Indemnified Party for, all claims asserted by a third party, other than another Fitness 19® Fitness Center, arising out of our negligence, material defaults or intentional misconduct toward that third party.  Each Licensee Owner Indemnified Party has the right to defend any claim at our expense if we fail to defend the claim in a commercially reasonable manner.  This indemnity will continue in full force and effect notwithstanding the termination or expiration of this Agreement.

8

I.    **STANDARD CLAUSES.**

1.    Amendments; Waivers.  The provisions of this Agreement may be modified only by written agreement between the parties. Any waiver of your or our rights or obligations under this Agreement shall be effective and enforceable only if reduced to writing by the party granting the waiver.  Waivers may be withdrawn at any time by the party granting them.

2.    Entire Agreement.  This Agreement constitutes the complete and exclusive statement of the agreement between us and you regarding the matters expressed herein.  This Agreement supersedes and replaces all prior proposals, understandings, and all other agreements, oral or written (including where your Fitness Club has operated pursuant to an oral agreement or a franchise agreement prior to the date of this Agreement), relating to the subject matter of this Agreement.  There are no other oral or written understandings or agreements between us and you relating to the subject matter of this Agreement. Nothing in this or in any related agreement, however, is intended to disclaim the representations we made in the Disclosure Document that we furnished to you.

3.    Costs and Attorneys' Fees.  The prevailing party in any litigation or arbitration shall be entitled to recover from the other party all damages, costs and expenses, including arbitration and court costs and reasonable attorneys' fees, incurred by the prevailing party in connection with such arbitration or litigation.

4.    No Off-Sets; Cumulative Rights.  You may not take any off-sets from any amounts due us or our Affiliates under this Agreement or any other agreements.  Our and your rights under this Agreement are cumulative, and no exercise or enforcement of any right or remedy shall preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we or you are entitled by law to exercise or enforce.

5.    Arbitration.  All disputes between us or any of our Affiliates, and our and their respective owners, officers, directors, agents, and employees, and you (and/or your Owners, guarantors, Affiliates, officers, directors, agents, and employees, if applicable) arising out of or related to this Agreement or any provision of this Agreement (including the validity and scope of the arbitration obligation under this Section I.5, which we and you acknowledge is to be determined by an arbitrator, not a court), any other agreement between us (or our Affiliate) and you, or any aspect of our and your relationship, will be determined exclusively by binding arbitration to be conducted by one (1) arbitrator under the then-current commercial arbitration rules of the American Arbitration Association. Arbitration proceedings must be held in the city and state where the Fitness Club is located, or such other location to which you and we agree in writing.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).  The interim and final awards of the arbitrator shall be final and binding upon each party, and judgment upon the arbitrator's awards may be entered in any court of competent jurisdiction.

We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.  We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any claim which is not submitted or filed as required is forever barred.  The arbitrator may not consider any

9

settlement discussions or offers that might have been made by either you or us and shall not have the right to declare any Mark generic or otherwise invalid. Except as described in Section I.8, we and you and your Owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between you and us, the party making a claim will be limited to equitable relief and to recovery of any actual damages he, she, or it sustains. We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so shall not be deemed to have waived or relinquished our right to seek the recovery of those costs in accordance with Section I.3 above.

Arbitration must be conducted on an individual, not a class-wide, basis; only we (and/or our Affiliates, and our and their respective owners, officers, directors, agents, and employees) and you (and/or your Owners, guarantors, Affiliates, officers, directors, agents, and employees, if applicable) may be the parties to any arbitration proceeding described in this Section I.5; and no such arbitration proceeding may be consolidated with any other arbitration proceeding between us and any other person, corporation, limited liability company, or partnership. Notwithstanding the foregoing or anything to the contrary in this Section I.5, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section I.5, then all parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding in accordance with Section I.7.

Notwithstanding anything to the contrary contained in this Section I.5, we and you each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction pursuant to Section I.7. In that case, we and you agree to contemporaneously submit our dispute for arbitration on the merits according to this Section I.5. The provisions of this Section I.5 will continue in full force and effect notwithstanding the termination or expiration of this Agreement and are intended to benefit and bind certain third-party non-signatories.

6.    <u>Governing Law</u>.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 <u>et seq.</u>).  Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (15 U.S.C. §§ 1051 <u>et seq.</u>), the United States Copyright Act, or other federal law, this Agreement, the License, and all claims arising from the relationship between us and you will be governed by the internal laws of the state where your limited liability company was organized, without regard to its conflict of laws principles, except that the provisions of any law of that state regarding franchise disclosure, registration or relationship and the regulations thereunder shall not apply unless its jurisdictional requirements are met independently without reference to this Section.

7.    <u>Consent to Jurisdiction</u>.  Subject to our and your arbitration obligations in Section I.5, you and your owners agree that all judicial actions brought by us against you or your owners or by you or your owners against us or our Affiliates, or our or their respective owners, officers, directors, agents, or employees, must be commenced in a court of general jurisdiction sitting in (or nearest to) the city and state where the Fitness Club is located, and you (and each owner) irrevocably submit to the jurisdiction of those courts and waive any objection you (or the owner) might have to such jurisdiction of or venue therein. Notwithstanding the foregoing, we may bring an action for a temporary restraining order or for temporary or preliminary injunctive

10

relief, or to enforce an arbitration award, in any federal or state court in the state in which you reside or the Fitness Club is located.

8.    <u>Waiver of Punitive Damages</u>.  Except with respect to your and our obligation to indemnify the other pursuant to Section H.3 for claims of others seeking to recover punitive or exemplary damages, we and you and your owners waive to the fullest extent permitted by law any right to or claim for any punitive or exemplary damages against the other and agree that, in the event of a dispute between you and us, the party making a claim will be limited to equitable relief and to recovery of any actual damages he, she, or it sustains.

9.    <u>Limitations of Claims</u>.  Except for claims arising from your non-payment of amounts due under this Agreement, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless an arbitration proceeding is commenced in accordance with this Agreement within one (1) year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims.

10.    <u>Notices and Payments</u>.  All approvals, requests, notices, and reports required or permitted under this Agreement will not be effective unless in writing and delivered to the party entitled to receive the notice in accordance with this Section I.10.  All such approvals, requests, notices, and reports, as well as all payments, will be deemed delivered at the time delivered by hand; or one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or three (3) business days after placement in the United States Mail by registered or certified mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any approvals and notices that we provide to you or your Owners, at the Fitness Club's address.  As of the Effective Date of this Agreement, notices should be addressed to the following addresses unless and until a different address has been designated by written notice to the other party:

To us:                            F19 Franchising, LLC
                                  4810 Point Fosdick Dr. #7
                                  Gig Harbor, WA 98335

Notices to you and the Owners:    As indicated on the Signature Page.

## J.    DEFINITIONS.

For purposes of this Agreement, the terms listed below have the meanings that follow them.  Other terms used in this Agreement are defined and construed in the context in which they occur.

"<u>**Affiliate**</u>" as used with respect to you or us, means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling, you or us (as applicable).  For purposes of this definition, "**control**" of a person means ownership or control of a majority of the voting ownership of the person or any combination of voting ownership and/or one or more agreements that together afford control of the management and policies of such person.

11

"**Owner**" means any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in you or in any entity that directly or indirectly holds an ownership interest or voting rights in you.

### K.     <u>ACKNOWLEDGMENTS</u>.

Before signing this Agreement, you and your owners should read it carefully with the assistance of legal counsel.  You and your owners acknowledge that:

1)     The success of your Fitness Club involves substantial risks and depends on your ability as an independent businessperson and your active participation in the daily affairs of the business, and

2)     You have not been given any assurance or warranty, express or implied, by us or our representatives as to the potential success of the Fitness Club, the viability of the Fitness Club site or the earnings likely to be achieved from the operation of the Fitness club, nor have you relied upon any such assurance or warranty in executing this agreement; and

3)     No statement, representation, or other act, event, or communication, except as set forth in this document and in any franchise disclosure document supplied to you and your owners, is binding on us in connection with the subject matter of this Agreement.

**INTENDING TO BE LEGALLY BOUND**, the parties have executed and delivered this Agreement on the dates shown below their respective signatures, to be effective as of the Effective Date.

**[Signatures on Next Page]**

12

**F19 FRANCHISING, LLC**

By: _____

Name: _____Robert Lineberger_____

Title: _____member_____

**FRANCHISEE:**    **ENDO Fitness Moorpark, LLC**

By: _____

Name: _____Bob Rodger_____

Title: _____Managing Member_____

Address for Notice Purposes:

_____960 Ellington Lane_____

_____Pasadena, CA 91105_____

Attn: _____Bob Rodger_____    ***

13